UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80912-CIV-HURLEY/HOPKINS

JOHN WAJCMAN and CHARLES ASHMORE,
on behalf of themselves and others similarly situated,
    plaintiffs,

vs.

INVESTMENT CORPORATION OF PALM BEACH
d/b/a PALM BEACH KENNEL CLUB,
    defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Preface

This is an FLSA case brought by several former poker dealers employed in the cardroom at the Palm Beach Kennel Club ("Kennel Club") in West Palm Beach. The case is now before the court on the defendant's motion for summary judgment.[DE# 14] The issue presented is whether the Kennel Club illegally took a "tip credit" against the dealer staff's required hourly wage, where the dealers were required to share tips with floor supervisors having limited customer interface.

### II. Fact Background

The named plaintiffs are former poker dealers employed in the cardroom of the Kennel Club between 2004 and 2007. Their job responsibilities included dealing cards to customers in a controlled setting, maintaining good public relations with customers, controlling the game, and handling the chips and cards in a professional and orderly manner.

Other cardroom employees at the Kennel Club include the poker room director; cardroom manager; cardroom supervisor; head cashier, cashier, hostess/host; currency supervisor; administrative assistant; card counter and card inspector.

The cardroom supervisor was responsible for overseeing the dealers and attending to any customer complaints. The more specific duties of the supervisor included maintaining paperwork pertaining to opening and closing games; organizing and giving direction to dealers about games; authorizing dealer breaks; functioning as initial decision maker in all games; inspecting dealers and hosts for grooming and dress standard compliance; observing and recording the daily drop count. In addition, the supervisors were responsible for intervening to resolve any disputes over the games which might arise between customers and dealers.

Supervisors spend roughly 90% of their shift on the cardroom floor. There is no indication in the record, however, as to what proportion of that time was spent mediating customer/dealer disputes. It is undisputed that the supervisors have no authority to hire or fire employees, or to even make recommendations in this area. Moreover, they do not do payroll or budgeting, do not determine the rate or method of payment of wages, do not write employee evaluations, scheduling or decide any other conditions of employment for other employees.

Poker dealers at the Kennel Club receive tips from their daily dealing of cards to customers in the cardroom, and from dealing of cards to customers in tournaments. During the pertinent time frame, all of the dealer tips were pooled, and the dealers were required to contribute 5% of the total to a tip pool. The tip pool was then distributed to the participating employees (not including dealers) according to the number of hours worked for each week. The employees that shared in the pool included cashiers/ head cashiers, hostesses/hosts, and floor supervisors. The remaining

cardroom employees (director; cardroom manager, currency supervisor, administrative assistant, card counter and card inspector) were excluded from the pool.

The Kennel Club paid the poker dealers the minimum wage, using a $3.02 tip credit. This resulted in payment of direct hourly wage of $2.25/hr for the dealers between October, 2004 and May, 2005; $3.13/hr between May, 2005 and December, 2005; and $3.38 per hour to $3.65 /hr between January, 2007 to the present.

From October 4, 2004 to the end of their employment, the plaintiff poker dealers always received more than $30 per month in tips in any month in which they performed services for the Kennel Club. In addition, from October 4, 2004 to the present, all of the employees who participated in the cardroom tip pool always received tips from the pool in excess of $30 per month [with the occasional exception of lesser amounts generated in the initial or terminal months of their employment].

### III. Discussion

The FLSA allows employers to pay less than minimum wage to employees who receive tips. 29 U.S.C. § 203(m). The mechanism it creates to allow employers to pay less than minimum wage is the "tip credit." The tip credit allows employers to include in its calculation of a "tipped employee [s]" wage the amount that an employee receives in tips up to fifty percent of the minimum wage:

> In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of ... 50 percent of the applicable minimum wage rate after March 31, 1991, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee.

29 U.S.C. § 203(m).

Thus, employers can only take a tip credit toward the wages of employees who qualify as "tipped employee [s]." A "tipped employee" is defined as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).

The implementing regulations for § 203(m) define "tip" as follows:

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amounts are matters determined solely by the customer, and generally he has the right to determine who shall be the recipient of his gratuity. In the absence of an agreement to the contrary between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer.

29 C. F. R. § 531.32.

For purposes of making the $30/month statutory threshold calculation, it is not necessary that the employee receive the tips directly from the customer: Rather, the implementing regulations contemplate that tips received from a tip pool may properly be included in the calculation:

> Where employees practice tip splitting, as where waiters give a portion of their tips to busboys, the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t).

29 C. F. R. § 531.54.

In addition to the "tipped employee" limitation on use of the tip credit, an employer seeking to use a tip credit toward an employee's minimum wage must satisfy two other conditions:

(1) the employee must be informed by the employer of the provisions of the tip credit subsection of the FLSA;

(2) the employee must be allowed to retain all tips which he/she receives, except in instances where pooling of tips is employed among other employees who "customarily and regularly receive tips."

29 U.S.C. § 203(m).

To satisfy the first prong, an employer must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligation. *See e.g. Martin v Tango's Restaurant, Inc.*, 969 F.2d 1319 (1st Cir. 1992). The parties raise no dispute regarding the sufficiency of the notice requirement in this case. The controversy centers instead on the second prong, where plaintiffs argue that supervisors are not "tipped employees" because they are not "engaged in an occupation in which they customarily and regularly receive...tips."

In determining whether an employee is engaged in an occupation that "customarily and regularly" receives tips for purposes of § 203(t), the focus is properly drawn to the question of whether the employee performs important customer service functions, i.e. does the employee have more than *de minimis* service interaction with customers. *See e.g. Kilgore v Outback Steakhouse of Florida, Inc.,* 160 F.3d 294 (6th Cir. 1998)(restaurant hosts held "tipped employees," noting they perform important customer service function by greeting customers, supplying them with menus, seating them at tables, unlike other restaurant employees like dishwashers, cooks, or off hour employees (janitors) who do not directly relate with customers at all; additionally, fact that Outback prohibits hosts from receiving tips directly from customers provides some evidence that the Outback hosts work in an occupation that customarily and regularly receives tips); *Dole v Continental Cuisine, Inc.,* 751 F. Supp. 799 (E.D. Ark. 1990)(upholding mandatory tip pool where servers tipped out solely to a maitre 'd who received no tips directly from customers, and whose responsibilities included setting up dining room, greeting and seating customers, serving first drink to customers, and assisting servers and serving customers as needed). *Compare Elkins v Showcase, Inc.*, 237 Kan. 720, 704 P.2d 977, 989 (Kan. 1985)(non-service bartenders are not tipped employees

because they were located behind wall, and thus had no contact with customers and were not in a position to receive tips) .[1]

In this case, defendant contends that "customer relations is an essential part" of the supervisor's job, but the only concrete example it gives of supervisor-customer contact in the cardroom involves the supervisor's role as mediator of customer complaints with the dealers. The record is devoid of any evidence regarding the amount of time which they typically devote to this discrete task, and it is devoid of any competent evidence tending to suggest a quality of interchange between supervisors and customers that is designed or likely to enhance the customer's cardroom experience. In other words, there is no evidence tending to show that the floor supervisors were engaged in services on the floor that were a likely subject of tipping.

In the latter regard, the defendant notably does not proffer any affidavit or other testimonial evidence from any current or prior floor supervisors which speaks to this issue. From the evidence currently on file, it appears that the supervisor's presence on the cardroom floor was not to serve and interact socially with customers (like a maitre d, waiter or host), but rather was primarily

---

[1] On the other hand, the practice of forced sharing of tips with management is an illegal practice, regardless of whether the members of management are also engaged in services that could be the subject of tipping. This type of tip sharing is deemed to violate the statutory condition that "all tips" received by the employees be "retained" by the "employees." 29 U.S.C. § 203(m).
    The theory here is that employees who exercise substantial managerial authority over the day to day operations of the business are functionally the "employers" themselves. *See e.g. Chung v New Silver Palace Restaurant*, 246 F. Supp. 2d 220 (S.D. N.Y. 2002)(finding invalid tip pool where waiters tips were shared with "black jackets" who held managerial authority and ownership interests in restaurant, and who also exercised substantial managerial authority over day to day operations); *Ayres v 127 Restaurant Corp.*, 12 F. Supp. 2d 305 (S.D. N.Y. 1998)(general manager of restaurant, who had full authority to suspend or terminate employees, supervised wait staff, made hiring decisions, assumed responsibility for budget and received weekly salary of $2000 was not an employee who "customarily and regularly received tips" under the FLSA).

designed to check or police the operations of the poker dealers.[2]

In defending the composition of its cardroom tip pool, the Kennel Club takes the extreme position that only those employees who have *no* customer contact are properly excluded from the definition of tipped employees. *See Myers v Copper Cellar Corp.,* 192 F.3d 546 (6th Cir. 1999)(salad makers did not engage in customarily "tipped" occupation and could not be included in tip pool where they had no personal contact with diners, labored outside diners' view, and performed duties traditionally classified as food preparation or kitchen support); *Elks v Showcase, Inc.*, 237 Kan. 720, 704 P.2d 977 (1985)(non- service bartenders behind tip wall did not have contact with customers and were not properly included in tip pool).

Stretched to its illogical extreme, this view would permit any employee with something more than *de minimus* customer contact to qualify as a "tipped employee" under § 203(t). This result would render meaningless the statutory requirement that a "tipped employee" be engaged in an "occupation" that "customarily and regularly" receives tips. With this restriction on the composition of tip pools, the inquiry properly looks to both the quantity and quality of customer interaction. For example, a security detail or bouncer at a restaurant or club would clearly be an employee involved in significant customer interface, but --- like cardroom supervisors dealing with irate customers on the poker board ---security personnel are not engaged in an occupation that customarily and regularly receives tips. While the job might entail significant customer interface,

---

[2] Affidavit of Glenn Stewart, former Kennel Club cardroom supervisor. Stewart avers that the defendant's supervisors were primarily engaged to supervise poker dealers, had minimal interaction with customers, were positioned on the floor to supervise the dealers, were not working for tips, and were never told that customer relations was an essential part of their job This is the only testimony from a floor supervisor on record which is proffered by the plaintiffs in this proceeding.

it does not involve the exchange of pleasantries or provision of personal services that ordinarily evokes tipping generosity. Moreover, once a patron on a poker board has a problem that rises to the level of supervisor intervention, it is difficult to conceive, regardless of the resolution, that the episode is likely to trigger a tipping response from the customer. In any event, there is no evidence in this record of any industry practice or custom pertaining to tipping of floor supervisors, more commonly known as "pit bosses," on the cardroom floor which would allow the court to assess whether this discrete category of cardroom employee meets the statutory definition of "tipped employee."

### IV. Conclusion

The burden is on the Kennel Club, as the moving party in this summary judgment proceeding, to show that there is no genuine issue of material fact pertaining to the eligibility of floor supervisors or "pit bosses" to share in the cardroom tip pool as "employees who customarily and regularly receive tips " That is, the burden is on the Kennel Club to establish that the cardroom floor supervisors are employees who are engaged in an occupation that is traditionally the subject of tipping.

This burden has not been met here, where there are disputed issues of material fact on the quantity and quality of supervisor-customer interaction on the cardroom floor. It cannot be said on this record that the floor supervisor is a "tipped employee" within the meaning of § 203(t), and consequently genuine issues of material fact remain as to whether he was prohibited from participating in a tip pool with the dealers.

Accordingly, the court finds a genuine issue of material fact on the contingent question of whether the Kennel Club improperly took a tip credit under federal law, precluding summary

judgment for the Club on the poker dealers' claim that the Club violated the FLSA by paying tip credit wages to them. *See e.g. Hai Ming Lu v Jing Fong Restaurant, Inc*., 503 F. Supp.2d 706 (S. D. N. Y. 2007); *Davis v B & S, Inc*., 38 F. Supp. 2d 707 (N.D. Ind. 1998)(genuine issue of material fact existed as to whether manager was tipped employee and therefore permitted to participate in top pool with employee);

It is accordingly **ORDERED AND ADJUDGED**:

1. The defendant's motion for summary judgment [DE#14] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 20th day of March, 2008.

Daniel T. K. Hurley
United States District Judge

cc. All counsel