UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-80912 CIV-HOPKINS

JOHN WAJCMAN and CHARLES
ASHMORE, on behalf of themselves
and all others similarly situated,

               Plaintiffs,

v.

INVESTMENT CORPORATION OF
PALM BEACH, d/b/a/ PALM BEACH
KENNEL CLUB, a Florida Corporation,

               Defendant.
_____/

## DEFENDANT INVESTMENT CORPORATION OF PALM BEACH, d/b/a/ PALM BEACH KENNEL CLUB's MEMORANDUM OF LAW ON ISSUE OF GOOD FAITH

### INTRODUCTION

On March 5, 2009, the jury in this action returned a verdict which found that the Kennel Club did not establish, by a preponderance of the evidence, that its tip pool was legal. Significantly, the jury also found that the Kennel Club's conduct was not willful, *i.e.* it did not knowingly violate the FLSA, nor did it show reckless disregard for the legality of the tip pool.

Although the jury found that the Kennel Club did not knowingly violate the FLSA, or act in reckless disregard of that standard, the issue of "good faith", and whether the Kennel Club should pay twice the amount of damages awarded by the jury, must be decided by the Court.

### THE LAW

There are two components to the Court's analysis of the good faith issue. The first

(subjective) component is an evaluation of the Kennel Club's intentions. "The 'good faith' of the statute requires, we think, only an honest intention to ascertain what the Fair Labor Standards Act requires and to act in accordance with it." *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 93 (2d Cir.) cert. denied, 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953).

The second component, by contrast, is an objective analysis in which the Court must look to the Kennel Club's evidence that it had reasonable grounds for believing that its conduct complied with the law. An employer must show that it "had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act ..." *Dybach v. State of Florida Department of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991).

## I.   HONEST INTENTIONS

Although an employer's "honest intentions" is a subjective determination, in this case it is obvious from the evidence that the Kennel Club honestly intended to comply with applicable law. Consider, *inter alia*, the following evidence:

- **Change in Florida Law**: The Kennel Club's tip pool was created in response to changes in Florida law which increased betting limits and pot sizes at poker rooms.[1]

- **Dramatic Increase in Dealer Tips**: These changes in the law, which became effective on July 1, 2003, increased the size of poker pots as much as twenty-fold, and the amounts of tips given to poker dealers at the Kennel Club increased

---

[1]   Trial and affidavit testimony of Renee Lampman; trial testimony of L. Michael Cernobyl.

accordingly.[2]

- **Amount of Unreported Tips Grows**: The dramatic increase in the amounts of tips being received by poker dealers at the Kennel Club led to a comparable increase in unreported dealer tips.[3]

- **Multiple Problems Result from Unreported Tips**: The increased underreporting of dealer tips resulted in (1) non-payment of taxes to the Internal Revenue Service, (2) insufficient funds to allow the dealers to participate in 401k plans, (3) inability of dealers to take advantage of the Kennel Club's 401k matching policy, (4) inability of poker dealers to participate in health, life and dental insurance plans, (5) inability of poker dealers to take advantage of employee savings plans offered by the Kennel Club; and (6) morale problems amongst other employees in the poker room who knew that dealers were not disclosing all of their tips and felt that this practice reduced the amount of money which they received from tip sharing.[4]

- **Substantial Pay Inequities**: Out of all of the employees working on the poker room floor, and providing services to the customer in order to enhance the customers' experience, and despite the increased risks and stresses which affected all of the employees, only the poker dealers were reaping the benefits of increased tips, and their selfish conduct in underreporting their tip income was being

---

[2] Trial and affidavit testimony of Renee Lampman.

[3] According to Ms. Lampman, when the Kennel Club began counting the dealers' tips it learned that they were twice the amount reported by the dealers.

[4] Trial and affidavit testimony of Renee Lampman.

rewarded.[5]

- **Security and Safety Problems**: Security and safety concerns arose because poker dealers were now leaving the building late at night with hundreds of dollars in cash in their pockets.[6]

- **Pay Disparity**: Although the card room needed competent, experienced floor supervisors on the poker room floor, the increased pay disparity between dealers and floor supervisors made the floor supervisor position increasingly less attractive.[7]

- **Cernobyl Suggests Tip Pool**: The Kennel Club's cardroom director at that time, Michael Cernobyl, knew that many other Florida cardrooms had implemented tip pools in response to this problem, and that the use of tip pools had become a common practice in the industry. He recommended that the Kennel Club address the problems caused by the increase in betting limits by administering a tip pool.[8]

- **Lampman Conducts Due Diligence**: Following Mr. Cernobyl's tip pool recommendation Renee Lampman, the Kennel Club's Employee Relations Manager, conducted due diligence to confirm that a Kennel Club tip pool would be

---

[5] Trial and affidavit testimony of Renee Lampman.

[6] Trial and affidavit testimony of Renee Lampman.

[7] Trial testimony of Renee Lampman

[8] Trial and affidavit testimony of Renee Lampman; trial testimony of L. Michael Cernobyl.

legal.[9] Her due diligence included, *inter alia*, the following:

(a) Ms. Lampman familiarized herself with the applicable law governing tip pools, including the relevant provisions of the FLSA.

(b) Ms. Lampman had meetings about the proposed tip pool with other members of the Kennel Club's compensation committee.

(c) Ms. Lampman consulted with the Kennel Club's attorneys to be sure that the proposed tip pool would be in compliance with applicable law and administrative regulations.

(d) Ms. Lampman educated herself as to the types of activities which could affect an employee's eligibility to participate in a tip pool.[10]

(e) Ms. Lampman had many conversations with other cardroom facilities, both within and outside of the State of Florida, to better understand their practices and procedures regarding tip pools.[11]

---

[9] Both Renee Lampman and Michael Cernobyl testified that, as Employee Relations Manager, it was Ms. Lampman's responsibility to conduct due diligence on behalf of the Kennel Club as to the legality of the suggested tip pool.

[10] Ms. Lampman became aware, for example, of the requirement that participating employees be "tipped employees." She was aware that floor supervisors could not participate in the tip pool if they were involved in the hiring, firing or disciplining of other employees and that they could not set salaries or otherwise be involved in payroll issues. As Employee Relations Manager, Ms. Lampman was aware that floor supervisors at the Palm Beach Kennel Club did not hire, fire, discipline or involve themselves in payroll issues or participate in any other activities which would disqualify them from participating in a tip pool. (Testimony and Affidavit of Renee Lampman)

[11] Ms. Lampman learned not only that most other facilities had tip pools, but also that floor supervisors almost always participated in those tip pools. She confirmed that the position of floor supervisor was a standard and common occupation in the gaming industry, and that floor supervisors customarily and regularly received tips at virtually all facilities.

  (f) Ms. Lampman learned that the use of up to 15% of dealers' tips was legal, and that most cardrooms applied 10% of dealer tips to tip pools. The Kennel Club, nevertheless, used only 5%.

  (g) Ms. Lampman was aware of the job responsibilities of PBKC's floor supervisors, both as to what they did and what they did not do.[12]

- **Ineligible Employees Were Excluded from the Tip Pool**: While cashiers, hosts and floor supervisors participated in the tip pool, other positions were considered but not included because the Kennel Club did not believe that those positions properly qualified to participate under applicable law.[13]

- **Expense Reduction Was Not A Factor**: While counsel for Plaintiffs attempted to argue to the jury that the Kennel Club's creation of the tip pool was motivated by a desire to save money on salaries, Plaintiffs presented no evidence to support that theory.[14]

---

[12] Ms. Lampman was aware, for example, that the floor supervisors interacted with customers and that a significant part of their responsibility was to ensure the positive experience of those customers.

[13] Positions which were considered but rejected for inclusion in the tip pool included, for example, the card inspector and the vault manager. Affidavit of Renee Lampman.

[14] Even if saving money had been the Kennel Club's motive, and there was no evidence to support that conclusion, there is nothing inherently wrong with a corporation trying to save money so long as it does so legally. Therefore, whether or not the Kennel Club expected to save money is irrelevant to the issue of good faith. The questions, regardless of the Kennel Club's motive, are (A) whether the Kennel Club honestly intended to follow the law, and (B) did it have reasonable grounds for believing that the tip pool was legal. In any event, Renee Lampman testified that the decision to implement a tip pool was *not* motivated by a desire to save money by taking tips away from dealers in order to pay others.

- **The Tip Pool Increased The Kennel Club's Expenses**: The implementation and administration of the tip pool created significant new accounting and administrative burdens[15] and expense; it actually costs the Kennel Club money.[16]

- **Kennel Club Believed Tip Pool Legal**: At the time the tip pool was implemented, after significant due diligence, the Kennel Club believed that its tip pool was entirely legal. It was consistent with industry standards, and designed to comply with the advice of legal counsel.[17]

- **No Reason to Believe Tip Pool Invalid**: At no time prior to the filing of this lawsuit was it suggested, or did PBKC have any reason to believe, that the tip pool was improperly constituted or illegal in any manner.[18]

<u>The Cumulative Weight of the Evidence Confirms that the Kennel Club Had Honest Intentions</u>

As mentioned above, it is the Court's role to examine the evidence and determine whether or not the employer had <u>honest intentions</u> with respect to the conduct which was later found to violate the FLSA. To satisfy the "subjective good faith component, the employer has the burden

---

[15] As set forth in Ms. Lampman's affidavit, the implementation of the tip pool created so much new paperwork that it also caused the Palm Beach Kennel Club to create an entirely new administrative position for an assistant who works exclusively on cardroom payroll.

[16] Implementation of the tip pool caused all dealer tips to be reported (which they had not been previously). As a result, the Kennel Club began paying payroll taxes and matching 401k contributions on dealer earnings which otherwise would have gone unreported. (Testimony and Affidavit of Renee Lampman)

[17] Even the Plaintiffs' witness, Michael Cernobyl, who was fired by the Kennel Club and prosecuted for theft, freely acknowledged that he believed that the Kennel Club Club tip pool was legal.

[18] Trial and affidavit testimony of Renee Lampman.

of proving that it had an honest intention to ascertain what the Act requires and to act in accordance with it." *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir.1991). The above-described evidence, most of which is uncontested,[19] proves that the Kennel Club had an honest intention to ascertain what was required by the law and to act accordingly.

The Kennel Club implemented its tip pool at the suggestion of Michael Cernobyl in order to address a number of problems which resulted from a change in the law which caused a dramatic rise in the amount of tips received by poker dealers. Those problems included, *inter alia*, under reporting of tips, non-payment of taxes, inability to participate in employer matched 401k plans, inability to obtain employer provided health, life and dental insurance, morale problems and safety concerns.

Prior to implementing the tip pool, the Kennel Club, through its Employee Relations Manager, Renee Lampman, conducted extensive due diligence in an honest attempt to ascertain and comply with the law. Ms. Lampman not only familiarized herself with the applicable law, including the FLSA, she also consulted with members of the compensation committee, consulted with lawyers, and consulted with other cardrooms both within and outside of the State of Florida.

Ms. Lampman knew that floor supervisors had more than the required *de minimis* interaction with customers required to participate in a tip pool. She knew that floor supervisors did not hire, fire, discipline or undertake any other job responsibilities which would preclude them

---

[19] It is instructive to note that the Plaintiffs did not contest most of the relevant evidence on this issue. During argument the Kennel Club reminded the jury that the Plaintiffs did not challenge, on cross-examination, Ms. Lampman's testimony that before implementing the tip pool she sought the advice of her attorneys, and familiarized herself with the applicable laws, regulations and industry custom. That testimony was essentially uncontroverted.

from participating in the tip pool. She excluded from the tip pool other occupations which did not meet the requirements of the FLSA. She established that floor supervisors were part of an occupation which customarily and regularly received tips. She confirmed that floor supervisors routinely received tips, both from customers and from tip pools. She learned that most cardrooms had already implemented tip pools. She learned that the law permitted the creation of a tip pool which deducted up to 15% of dealers' tips and that most facilities in Florida were deducting 10%, but the Kennel Club implemented a pool which deducted only 5%.

The tip pool was implemented by the Kennel Club in order to address problems which resulted from a change in the law. It was implemented only after extensive due diligence undertaken with the honest intention of ensuring that it complied in all respects with the FLSA. The Kennel Club never had any reason to believe that any aspect of its tip pool was illegal.

The evidence establishes that the Kennel Club has met its "burden of proving that it had an honest intention to ascertain what the Act requires and to act in accordance with it." *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir.1991).

## II.  THE OBJECTIVE COMPONENT

Kennel Club had reasonable grounds for believing that its conduct complied with the law.

To decide the objective component of the "good faith" analysis, courts evaluate evidence that the employer had reasonable grounds for believing that its conduct complied with the law. The evidence in this case, viewed in the context of applicable law in 2003 when the tip pool was implemented, unequivocally establishes that the Kennel Club had reasonable grounds for believing that its tip pool was legal and complied in all respects with the FLSA.

When the Kennel Club implemented the tip pool, both Federal and Florida law permitted employers to take a credit against the wages of a "tipped employee" and to pay that employee a lower direct cash wage. 29 U.S.C. §203(m)[20] and FL CONST. art. X, § 24.[21]

An employee could participate in a tip pool if he or she was a "tipped employee", which was defined in the FLSA as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. §203(t). Employees who received tips from a tip pool were employees who "receive tips" according to Department of Labor regulations and case law. 29 C.F.R. §531.54 states[22]:

---

[20]  29 U.S.C.§203(m) states, in pertinent part:

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to--

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

[21]  FL CONST. art. X,§ 24 (c) states, in pertinent part that, for tipped Employees meeting eligibility requirements for the tip credit under the FLSA, Employers could credit towards satisfaction of the Minimum Wage tips up to the amount of the allowable FLSA tip credit in 2003.

[22]  The Kennel Club is aware that this Court rejected this regulation at trial, and does not seek to reargue that decision in this memorandum. However, the context in which the Kennel Club's conduct must be judged is the authority available to the Kennel Club in 2003 when the tip pool was implemented. The Kennel Club could not reasonably be expected to foresee at that time that a trial court would reject this law in 2009. Moreover, all of the decisional law on this topic consistently held that in these circumstances the Code of Federal Regulations was entitled "to controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute." *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1565 (11th Cir.1991). "The presumption is that they are valid unless shown to be erroneously in conflict with the Act itself." *Bratt v. County of*

> Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t).

See *Kilgore v. Outback Steakhouse of Florida, Inc.,* 160 F.3d 294, 301 (6th Cir. 1998), *reh'g and suggestion for reh'g en banc denied* (6th Cir. 1998) (holding that employees who receive tips solely from a tip pool without contributing to the pool are employees who "receive tips" for purposes of 203(m) and 203(t) and it is not necessary that an employee receive the requisite amount of tips directly from a customer); *Dole v. Continental Cuisine, Inc.,* 751 F. Supp. 799, 801-03 (E.D.Ark.1990) (upholding a mandatory tip pool that benefitted a maitre d' who did not receive tips himself or contribute to the pool).

Working in concert, Federal statutory law, Federal decisional law, the Code of Federal Regulations, and the Florida Constitution constituted the legal context in which the Kennel Club's conduct must be assessed. The evidence shows that the Kennel Club's belief that it was in compliance with applicable law was reasonable because all of its decisions in implementing and administering the tip pool were consistent with these four guidelines.

That evidence includes, *inter alia*, the following:

- **Floor Supervisors Receive Tips Directly from Customers**: The uncontroverted evidence at trial established that floor supervisors regularly and customarily receive tips directly from customers. Chris Webster, who is currently a floor supervisor at the Kennel Club, testified that he regularly receives tips directly from

---

*Los Angeles*, 912 F.2d 1066, 1071 (9th Cir. 1990).

customers.[23] Noah Carbone, the Kennel Club's cardroom manager, testified that floor supervisors regularly receive tips directly from customers and that he received tips directly from customers when he was a floor supervisor. Jeffrey Gamber, the poker room director at Derby Lane in Tampa, testified that the floor supervisors at his facility are customarily and regularly tipped.[24]

One of the Plaintiffs in this action, Steven Geving, who was not called by Plaintiffs' counsel, testified that when he worked at the Pepper Mill it was customary for dealers to tip floor supervisors and that he tipped floor supervisors when he was a dealer. Mr. Geving also testified that when he worked at Bolder Station "it was customary to tip supervisors and support staff." He further testified that he would tip floor supervisors when he was a dealer and that he would accept tips from dealers when he was a floor supervisor.[25]

- **Floor Supervisors Receive Tips from Tip Pools**: Renee Lampman testified at trial that she was aware of the practices at other cardrooms and that she believed that the Kennel Club's tip pool was valid.[26] In her affidavit, Ms. Lampman states that

---

[23] Mr. Webster also testified that he plays poker at other cardrooms and that he routinely tips floor supervisors when he plays.

[24] The testimony of these witnesses was unchallenged and the Plaintiffs presented no competent contradictory evidence.

[25] Deposition testimony of Plaintiff Steven Geving read at trial by the Kennel Club.

[26] In order to comply with the Court's evidentiary rulings, Ms. Lampman did not specifically testify at trial as to the tip pool practices at other cardrooms. While the Kennel Club was not permitted to present to the jury evidence that floor supervisors at other facilities participate in tip pools, the Court clearly can consider such evidence in determining whether the Kennel Club had a reasonable basis for believing that floor supervisors regularly and customarily

through her due diligence prior to establishing the tip pool, she determined that "most other facilities had tip pools and that floor supervisors almost always participated in those tip pools." Ms. Lampman also "established that floor supervisors were a standard and common occupation in the gaming industry and that floor supervisors customarily and regularly received tips at virtually all facilities."[27]

- **Plaintiff Keith Miller Testified that Floor Supervisors Receive Tips from Tip Pools**: Plaintiff Keith Miller testified that, in addition to the Kennel Club, he also worked as a poker dealer at Mardi Gras (f/k/a Hollywood Greyhound), Isle of Capri and Ft. Pierce Jai Alai and that each of those facilities had mandatory tip pools in which floor supervisors participated.[28]

- **Plaintiff Emmanuel Santos Testified that Floor Supervisors Receive Tips from Tip Pools**: Plaintiff Emmanuel Santos testified that, in addition to the Kennel Club, he also worked as a poker dealer at Mardi Gras (f/k/a Hollywood Greyhound) and Melbourne Greyhound Park and that they had mandatory tip pools in which floor supervisors participated at each of those facilities.[29]

- **Plaintiff John Wajcman Testified that Floor Supervisors Receive Tips from Tip**

---

received tips and therefore could participate in a valid tip pool.

[27] Affidavit of Renee Lampman at ¶11.

[28] Proferred deposition testimony of Keith Miller at pp. 16-18, 23.

[29] Proferred deposition testimony of Emmanuel Santos at pp. 11-14.

- **Pools**: Lead Plaintiff John Wajcman testified that, in addition to the Kennel Club, he also worked as a poker dealer at Gulfstream Race Park and Hollywood Greyhound (n/k/a Mardi Gras) and that they had mandatory tip pools in which floor supervisors participated at each of those facilities.[30]

- **Plaintiff Sheldon Weinglass Testified that Floor Supervisors Receive Tips from Tip Pools**: Plaintiff Sheldon Weinglass testified that he received tips from dealers when he worked as a floor supervisor at Hamilton Jai Alai. Plaintiff Weinglass also testified that, in addition to the Kennel Club and Hamilton Jai Alai, he also worked at Melbourne Greyhound Park and that they had mandatory tip pools at each of those facilities.[31]

- **Floor Supervisors Have Direct Customer Contact and perform important customer functions**: Several witnesses, including Chris Webster, Noah Carbone, Ira Eisenberg, and some of the Plaintiffs, Laurie Barilla,[32] Deanna Buettner,[33] Javier Cruz[34] and Steven Geving,[35] testified that floor supervisors routinely

---

[30] Proferred deposition testimony of John Wajcman (at pp. 43-44).

[31] Proferred deposition testimony of Sheldon Weinglass (at pp. 21-22, 27-2811-14).

[32] Deposition testimony of Plaintiff Laurie Barilla which was read to the jury (at pp. 29-30).

[33] Deposition testimony of Plaintiff Deanna Buettner which was read to the jury (at pp. 20-21, 27-28).

[34] Deposition testimony of Plaintiff Javier Cruz which was read to the jury (at pp. 50-52, 58-60).

[35] Deposition testimony of Plaintiff Steven Geving which was read to the jury (at pp. 31, 33).

interacted with customers and performed important customer functions including, but not limited to, greeting customers by name, seating customers, answering customers questions, ensuring that customers have whatever they need, resolving disputes and keeping the games moving.

- **No Reason to Believe Tip Pool Invalid**: At no time prior to the filing of this lawsuit did the Kennel Club have any reason to believe, nor did the Kennel Club believe, that its tip pool was improperly constituted or in any manner illegal.[36] Renee Lampman's testimony that until this lawsuit was filed there was not even a suggestion that the tip pool was illegal was also unchallenged on cross-examination. Moreover, the Plaintiffs offered no evidence that it was even suggested to the Kennel Club management that the tip pool might be illegal.

It is undisputed that the FLSA permits employers to take a credit against the wages of a "tipped employee" and pay such an employee a lower direct cash wage. 29 U.S.C. §203(m).[37] It is also undisputed that this practice is specifically authorized by Article 10, Section 24 of the

---

[36] It is significant that none of the employees of the Kennel Club complained about the tip pool prior to instituting the lawsuit. The Court may deny or reduce liquidated damages where a plaintiff employee did not complain about an FLSA violation at the time of employment. *See Sack v. Miami Helicopter Service, Inc.*, 986 F. Supp. 1456, 1472 (S.D. Fla. 1997). In *Sack*, the Court held that key to determining good faith is whether a reasonably prudent person would have acted differently under such circumstances. The Court found that the employer acted in good faith and awarded only $100 in liquidated damages where the compensatory damages case was close and the employee did not complain to the employer prior to the lawsuit. *See also White v. Beckman Dairy Co.*, 352 F. Supp. 1266 (D.C. Ark. 1973) (liquidated damages denied where employee did not complain).

[37] A $3.02 per hour tip credit is allowed when the employee receives sufficient tips to make up the difference between the lower, "tip-credit" wage and the regular minimum wage.

Florida Constitution. And the law is clear that employers may take a tip credit towards the wages of a "tipped employee" if all tips received by the employee are retained by the employee or the employee participates in a tip pool "among employees who customarily and regularly receive tips." 29 U.S.C. §203(m). And, in determining whether employees are tipped employees and thus eligible to participate in a tip pool, the law draws no distinction between tips received by floor supervisors directly from customers and those received from a tip pool. According to Department of Labor regulations and case law, employees who receive tips from a tip pool are employees who "receive tips." Specifically, 29 C.F.R. §531.54 states as follows:

> Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t).[38]

See *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998), *reh'g and suggestion for reh'g en banc denied* (6th Cir. 1998) (holding that employees who receive tips solely from a tip pool without contributing to the pool are employees who "receive tips" for purposes of 203(m) and 203(t) and it is not necessary that an employee receive the requisite amount of tips directly from a customer).

A review of the evidence described above establishes that floor supervisors at the Kennel

---

[38] The Department of Labor's regulations are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Dybach v. State of Florida Department of Corrections*, 942 F.2d 1562, 1565 (11th Cir. 1991) citing *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)

Club receive tips both from the tip pool and directly from customers. That evidence, <u>including the testimony of several of the Plaintiffs</u>, also establishes that floor supervisors are also tipped at other cardroom facilities and that most, if not all, of the other facilities where the Plaintiffs worked had mandatory tip pools which included floor supervisors.

In light of this evidence, it was clearly reasonable for the Kennel Club to conclude that floor supervisors are tipped employees who are engaged in an occupation which they regularly and customarily receive tips. Because, under applicable law, floor supervisors are permitted to participate in the tip pool if they are "employees who customarily and regularly receive tips," the Kennel Club had a reasonable basis for believing the inclusion of floor supervisors in the tip pool did not render it invalid.

### The Kennel Club has met It Burden of Establishing Good Faith Under both the Subjective and Objective Components

An employer may avoid liquidated damages by demonstrating that the "act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA. 29 U.S.C. §260; *Spires v. Ben Hill County*, 980 F.2d 683, 689 (11th Cir. 1993). The FLSA "assigns to the judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150,1163 (11th Cir. 2008), *rehearing denied*, 518 F.3d 1302 (2008) (citing 29 U.S.C. § 260). *See also Williams v. R.W. Cannon, Inc,* 2008 WL 4097613 (S.D. Fla. 2008).

Cases applying Section 260's good faith defense have routinely held that liquidated damages are not appropriate where, as here, the employer presents evidence that it undertook good

faith efforts to ensure that it pay practices were compliant with the Fair Labor Standards Act. ("FLSA") In *Reyes v. Falling Stores Enterprises, Inc.*, 2006 WL 1319418 (M.D.Fla.2006), the court found that the evidence established that the defendant had both an objective and subjective good-faith belief that it was properly compensating its employees, and, therefore, an award of liquidated damages was not warranted.

From the evidence, it is patently clear that the Kennel Club honestly intended to comply with the FLSA and undertook extensive efforts to ensure that it was in full compliance with the FLSA. As such, the Kennel Club clearly meets the good faith requirement of section 260. As set forth above, the Kennel Club has satisfied its burden as the evidence establishes that, even if mistaken according to the jury, the Kennel Club clearly had a reasonable basis to believe that its tip pool was a valid tip pool.

WHEREFORE, the Defendant, INVESTMENT CORPORATION OF PALM BEACH, d/b/a/ PALM BEACH KENNEL CLUB, respectfully requests that this Honorable Court find that the Defendant acted in good faith and with reasonable grounds for believing that it was not violating the FLSA.

Certificate of Service

I HEREBY CERTIFY that on this 20th day of March, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is also being sent via U.S. Mail this day to: **Chad E. Levy, Esquire**, Law Offices of Levy & Levy, P.A., 300 Southeast 13th Street, Ft. Lauderdale, Florida 33316 and **Christopher J. Whitelock, Esquire**, Whitelock & Associates, P.A., 300 Southeast 13th Street, Ft. Lauderdale, Florida 33316.

FitzGerald Mayans & Cook, P.A.
NorthBridge Centre, Suite 900
515 North Flagler Drive
P.O. Box 3795
West Palm Beach, FL 33402
(561) 832-1667 (Telephone)
(561) 832-8678 (Facsimile)

_____
E. COLE FITZGERALD, III
Florida Bar Number: 177789
fitzgerald@fmc-lawfirm.com
GREGORY D. COOK
Florida Bar Number: 708496
Cook@fmc-lawfirm.com
LYNN G. HAWKINS
Florida Bar Number: 500704
lgh@twmi.rr.com