UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-80912 CIV-HOPKINS

JOHN WAJCMAN and CHARLES
ASHMORE, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

v.

INVESTMENT CORPORATION OF
PALM BEACH, d/b/a/ PALM BEACH
KENNEL CLUB, a Florida Corporation,

        Defendant.
_____/

## AFFIDAVIT OF RENEE LAMPMAN
## ON ISSUE OF GOOD FAITH

STATE OF FLORIDA      )
                                    )ss:
COUNTY OF PALM BEACH  )

      BEFORE ME, the undersigned authority, personally appeared RENEE LAMPMAN who, after being duly sworn, deposes and says:

      1.    I have personal knowledge of each of the facts set forth in this Affidavit and I am competent to testify as to those facts.

      2.    I understand that this Affidavit is to be filed in the United States District Court, Southern District of Florida, in support of Defendant INVESTMENT CORPORATION OF PALM BEACH, d/b/a/ PALM BEACH KENNEL CLUB's Memorandum on Issue of Good Faith.

3. At the time the tip pool which is the subject matter of this action was implemented, and at all times relevant, I was employed by the Defendant INVESTMENT CORPORATION OF PALM BEACH, d/b/a/ PALM BEACH KENNEL CLUB ("Palm Beach Kennel Club") as the Employee Relations Manager/Administrator, a position which I had held since July 12, 1993.

4. Effective July 1, 2003, the law changed in Florida with respect to the amounts which could be wagered at poker rooms in pari-mutuel facilities, including the Palm Beach Kennel Club. As a result of the change in wager limits rising from 25 cents to $1 and $2, the pots rose from a maximum of $10 to as much as $200.

5. As the size of the poker pots grew, so did the amounts of the tips being received by poker dealers at the Palm Beach Kennel Club.

6. The dramatic increase in the size of the poker pots and the commensurate increase in the amount of tips received by dealers resulted in a number of problems. For example, while poker dealers were now reaping the rewards of dramatically increased tips, the other employees on the poker room floor who were involved in the customer experience were not sharing in those rewards.

7. Another result of the dramatic growth in dealer tips resulting from the change in the law was the increase in the amount of dealer tips which were not being reported by the dealers. The extent of the under-reporting problem was such that, once the Palm Beach Kennel Club started tracking the tips actually earned, the amount of dealer tips reported doubled. The under-reporting of tips resulted in non-payment of taxes to the Internal Revenue Service, insufficient funds to allow dealers to participate in 401k plans or to take advantage of the company's 401k matching policy, participate in health, life and dental insurance plans or take advantage of other available savings

plans. The under-reporting of tips by dealers also led to morale problems as other customer service employees were aware of the under-reporting and related lack of tip sharing.

8. The increase in tips earned by dealers as a result of the change in the law also led to security concerns resulting from the fact that it became common knowledge that dealers were leaving the Kennel Club late at night with hundreds of dollars in cash in their pockets.

9. In my capacity as Employee Relations Manager at the Palm Beach Kennel Club and as a member of its compensation committee, I consulted with the cardroom manager at the time, Michael Cernobyl, regarding ways to address the above-mentioned problems which resulted from the changes in the law. Mr. Cernobyl suggested that the Palm Beach Kennel Club consider implementing a tip pool under the Fair Labor Standards Act ("FLSA") as that was a common practice in the industry.

10. As a member of the compensation committee and as Employee Relations Manager, it was my responsibility to evaluate the tip pool option and I did so through a number of meetings and through due diligence research. Before implementing a tip pool, I familiarized myself with the applicable law governing tip pools, including the relevant provisions of the FLSA. I had communications with other members of the compensation committee and with our attorneys. I learned which activities employees could and could not engage in if they were to participate in the tip pool. I became aware, for example, of the requirement of being a "tipped employee" and that floor supervisors could not participate in the tip pool if they were involved in hiring, firing or disciplining of other employees and that they could not set salaries of be involved in payroll issues. I was aware that the floor supervisors at the Palm Beach Kennel Club did none of those disqualifying activities.

11. As a further part of my due diligence prior to implementing the tip pool, I had many conversations with other pari-mutuel facilities, both within and outside of the State of Florida, to better understand their practices and procedures. Through this due diligence, I learned that most other facilities had tip pools and that floor supervisors almost always participated in those tip pools. I established that floor supervisors were a standard and common occupation in the gaming industry and that floor supervisors customarily and regularly received tips at virtually all facilities.

12. Through my due diligence, I learned that the law allowed the taking of up to 15% of dealers' tip and that most cardrooms had implemented tip pools which took 10% of dealers' tips. Nevertheless, we decided to implement a tip pool which only took 5% of dealer tips.

13. At the time the tip pool was implemented at the Palm Beach Kennel Club, I was aware of the job responsibilities of our floor supervisors, both as to what they did and what they did not do. I knew that the floor supervisors interacted with our customers and that a significant part of their responsibility was to ensure the positive experience of the Kennel Club's customers.

14. While the compensation committee ultimately created a tip pool in which cashiers, hosts and floor supervisors participated, other positions were considered but rejected for inclusion in the pool. For example, I rejected a suggestion that the card inspector participate in the tip pool because, while she was responsible for the cards which were used by the dealers, I did not feel that she did had a sufficient amount of customer contact to participate. Similarly, I rejected having the vault manager participate in the tip pool for the same reason.

15. The decision to implement a tip pool was not motivated by a desire to save money by taking tips away from dealers in order to pay others. To the contrary, not only did the implementation of the tip pool create significant new accounting and administrative burdens, but

rather than saving the Palm Beach Kennel Club money, it actually cost money. Implementation of the tip pool caused all dealer tips to be reported for the first time. As a result, the Palm Beach Kennel Club began having to pay payroll taxes (7.65%) on those newly reported amounts and its 401k matching contributions likewise rose. In addition, the implementation of the tip pool created so much new paperwork that it also caused the Palm Beach Kennel Club to create a new position and hire an administrative assistant who does nothing but cardroom payroll.

16. At the time the tip pool was implemented at the Palm Beach Kennel Club, I believed that the tip pool was entirely legal, appropriate and consistent with industry standards. At no time prior to this lawsuit being filed did I have any reason to believe, nor did I believe, that the tip pool was improperly constituted or in any manner illegal.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this 13th day of March, 2009.

_____
RENEE LAMPMAN

Sworn to and subscribed before me this 13 day of Mar, 2009, by RENEE LAMPMAN, who is:

X personally known to me, **OR**
__ has produced _____ as identification.

Notary Name: Debbie T Williams
Notary Public
Serial (Commission) Number
(if any) DD747684

(NOTARY STAMP)


Notary Public State of Florida
Debbie T Williams
My Commission DD747684
Expires 01/10/2012